UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DANIEL G. SMITH                                           CIVIL ACTION

VERSUS                                                   NO. 17-9899

OCHSNER HEALTH SYSTEM AND                                SECTION M (1)
OCHSNER CLINIC FOUNDATION

## ORDER & REASONS

Before the Court is the motion of defendants Ochsner Health System and Ochsner Clinic Foundation (collectively "Ochsner") for summary judgment,[1] to which plaintiff Daniel G. Smith ("Smith") responds in opposition,[2] and in support of which Ochsner replies.[3]  Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

## I.      BACKGROUND

This Fair Labor Standards Act ("FLSA") action arises out of Smith's allegations that he did not receive overtime compensation while employed as a non-exempt transplant (or organ procurement) coordinator for Ochsner.[4]  The job description for a transplant coordinator at Ochsner included the following duties and responsibilities: responding to all calls for organs offered to the Ochsner Transplant Center; evaluating the medical management of the donor; verifying consent; communicating with physicians and surgeons to obtain acceptance of an organ; preserving the organ; arranging transplantation; transporting organs; and completing all associated

---

[1] R. Doc. 33.
[2] R. Docs. 38 & 50.
[3] R. Docs. 45 & 51.
[4] R. Doc. 1 at 2-3.  Smith uses the term "transplant coordinator," R. Doc. 1 at 3, while Ochsner prefers the term "transplant procurement coordinator" or "organ procurement coordinator."  R. Docs. 21 at 2; 33-1 at 2.

reports.[5]  The parties essentially agree that transplant coordinators at Ochsner rotated among four categories of duties.[6]

***Donor Coordinator.***  The first category of duties was that of "donor coordinator."  In this capacity, the transplant coordinator would receive communications from the Louisiana Organ Procurement Agency ("LOPA") regarding organs potentially available for transplant.[7]  The donor coordinator would then access the donor's information on a database.[8]  On occasion, when acting as donor coordinator, Smith would identify a mistake in the database or a need for additional information, and he would contact the donor's hospital to obtain the correct information to provide to the transplant surgeon.[9]  After gathering this information, the donor coordinator could either decline the organ or, if the organ satisfied Ochsner's criteria (which is regulated by UNOS), enter a "provisional yes" before contacting the surgeon.[10] The "provisional yes" indicated Ochsner was interested in the organ.[11] To comply with UNOS regulations, Ochsner's established procedure required the donor coordinator to contact the surgeon on call and relay certain standard information.[12]  However, Smith testified to having rejected an organ without first contacting a surgeon if, in his experience and as dictated by the UNOS regulations, he knew the surgeon would

---

[5] R. Docs. 33-1 at 2-3; 38-15 at 1-2.  Smith does not contest this job description except to add that he was merely a "conduit" of information to his supervising surgeons.  R. Doc. 38-15 at 1-2.

[6] *See* R. Doc. 38-15 at 4-5.

[7] *Id.*  LOPA is a non-profit organ procurement organization ("OPO") that is responsible for the evaluation and procurement of deceased-donor organs for organ transplantation in Louisiana.  *About LOPA*, LOPA, https://www.lopa.org/about (last visited Nov. 9, 2018).  Each OPO is a member of the Organ Procurement Transportation Network ("OPTN"), a federally-mandated network created and overseen by the United Network for Organ Sharing ("UNOS").  *See About OPOs*, ASS'N OF ORGAN PROCUREMENT ORGS., www.aopo.org/about-opos/ (last visited Nov. 9, 2018); *see also* R. Doc. 38 at 2-3 (describing LOPA's organ recovery process).

[8] R. Doc. 38-15 at 5-6.

[9] *Id.* at 6.

[10] *Id.* at 7-8.

[11] *Id.* at 7.  According to an Ochsner transplant surgeon, Ochsner has a limited amount of time to accept or reject an organ.  R. Doc. 41-5 at 5.

[12] R. Doc. 38-15 at 1-2.  Although the donor coordinator could not withhold information generated by LOPA, the donor coordinator would "highlight [to the surgeon] the main parts that [the donor coordinator would] feel is important to that case."  R. Doc. 41-3 at 9.

not accept it.[13]  Nonetheless, no coordinator's decision was final; all decisions were reviewed by the surgeon.[14]  Dr. George Loss, a transplant surgeon at Ochsner who worked with Smith, testified that "it takes two to say yes … and three to say no" to an organ, a rule of thumb that both parties agree constitutes Ochsner's policy.[15]  Specifically, according to Dr. Loss, to accept an organ, the recovery coordinator and the surgeon may say "yes"; but to reject an organ, the recovery coordinator and two surgeons must say "no."[16]  Smith admits that he advocated for very sick Ochsner patients to receive organs ahead of patients at other transplant centers, as directed by his supervisors and as permitted under UNOS protocol.[17]

Although LOPA could provide the matching program's results directly to the surgeon, Ochsner handled "this aspect in-house" by employing coordinators such as Smith.[18]  Smith testified that, as donor coordinator, he communicated to the surgeon basic information generated by LOPA's matching program, such as the potential recipient's status on the list and the recipient's height and weight.[19]  On occasion, a donor coordinator would discuss with Dr. Loss, as transplant surgeon, the decision whether to accept the organ.[20]  Dr. Loss testified that the organ procurement coordinators were "absolutely critical" to Ochsner's success as a transplant center.[21]  Dr. Loss compared his interaction with the donor coordinator to that with a resident about a patient in the ICU: "They don't tell me everything that's going on with that patient … ; they tell me the things I

---

[13] R. Doc. 38-15 at 11.
[14] *Id.* at 2.
[15] R. Docs. 33-7 at 8; 38 at 21; 51 at 2.
[16] R. Doc 33-7 at 8.
[17] R. Doc. 38-15 at 15-16.
[18] R. Doc. 38 at 3.
[19] R. Doc. 41-1 at 9.
[20] R. Doc. 33-7 at 13.
[21] R. Docs. 38-15 at 12; 33-7 at 24.  For example, according to Dr. Loss, the donor coordinator saved the surgeon time by reviewing the medical record to screen for organs that were "marginal" or "that [the surgeon does not] need to be awakened for."  R. Doc. 33-7 at 22.  The donor coordinator would also discuss the viability of the organ with the surgeon.  *Id.* at 13.

need to know.  And they know the things I need to know because we work together and we know what's important.  But then there are certain parts that I ask more information, and they have to know where to get it or how to get it.  And if they don't, they ask me, and I tell them."[22]  According to Smith, the surgeons "depended upon us to be correct.  They trusted that the information we gave them would be correct to make a decision."[23]

Once an organ was accepted, the donor coordinator would arrange for the transportation of the organs.[24]  Although the organ procurement coordinators would not enter into transportation contracts on behalf of Ochsner, they would arrange transportation with companies under contract with Ochsner.[25]  In one instance, Ochsner implemented Smith's suggestion to purchase flight hours, rather than renting planes, as a means of managing transportation costs.[26]

***Fly Out Coordinator.***  The second category of duties for transplant coordinators was that of "fly out" coordinator. A fly out coordinator traveled with the medical team to assist in recovering the organ.[27]  The fly out coordinator would contact the operating room where the organ was to be recovered, and then the fly out coordinator would apprise the surgeon and Ochsner's operating room of the organ's history and condition (such as the timeline of surgery, biopsy results, size, and viability problems, including whether there had been unexpected occurrences potentially affecting the organ like no heartbeat or no blood pressure).[28]  To transport particular organs, Smith helped to create checklists of supplies and then stocked them based upon the surgeon's directives.[29]  But Smith insists that his supervisors would authorize supply orders costing more than $10,000.[30]

---

[22] R. Doc. 38-15 at 9.
[23] *Id.* at 6.
[24] *Id.* at 12.
[25] *See id.* at 13.
[26] *Id.*
[27] *See id.* at 13-14.
[28] *See id.* at 14-15.
[29] *See id.* at 14, 16.
[30] *Id.* at 16.

***Administrative and Backup Coordinator.*** The third category of a transplant coordinator's duties was that of administrative coordinator. An administrative coordinator was responsible for completing the paperwork related to the organ and Ochsner's patients.[31] For instance, after Ochsner's committee confirmed that a patient needed an organ transplant, the coordinator would input the patient's information into a database to be matched to a donor by the computerized system.[32]

The fourth and final category of an organ procurement coordinator's duties was that of backup coordinator. In this capacity, an organ procurement coordinator would assist with lab work and donors as needed.[33]

***The Rotating Duties in General.*** Under the supervision of a surgeon, the transplant coordinators working at Ochsner during Smith's employment conferred with each other to establish their schedule of rotating duties.[34] Generally, the hours were Monday through Friday from 8 a.m. to 5 p.m., though the coordinators were permitted to arrive later the next day following a late-night shift.[35] Smith and Kyle Leboeuf, who was also an organ procurement coordinator at Ochsner, testified that they would be on call for four days at a time.[36] Ochsner submits Leboeuf's testimony for the proposition that the organ procurement coordinators spent the majority of their time on donor coordinator duties.[37] Smith disputes this, citing Ochsner's Job Performance Standards that designate duties by weight.[38] These standards designate (1) fifteen percent weight

---

[31] *See id.* at 15.
[32] R. Docs. 41-3 at 39-41; 38 at 3.
[33] *See* R. Doc. 38-15 at 15.
[34] *See* R. Docs. 38-15 at 17; 41-1 at 20-21.
[35] *See* R. Docs. 38-15 at 17; 41-1 at 32, 36-37. Smith asserts that Dr. Loss prohibited the transplant coordinators from arriving late, but the parties seem to agree that Dr. Loss drew that line at 9 a.m. R. Docs. 38-15 at 17; 41-1 at 36-37.
[36] R. Docs. 41-4 at 34; 33-6 at 3.
[37] R. Doc. 33-3 at 5.
[38] R. Doc. 38-15 at 5.

to responding to calls for organ offers (including being on call "24 hours a day, 365 days/year"); (2) thirty percent weight to receiving and transporting organs for transplant preservation (including verifying legal aspects of the donor's consent and medical chart); (3) ten percent weight to having supplies and equipment on hand for cold storage preservation of organs; (4) ten percent weight to sending blood and tissue typing samples to the lab for cross-matching purposes; (5) ten percent weight to exchanges of donor/recipient information; (6) ten percent weight to preserving organs from living donor transplants; and (7) fifteen percent weight to assignment and documentation of costs and charges of the Ochsner Transplant Center's "organ procurement activities (i.e., procurement cost sheets, patient standard acquisition billing, professional fees, etc.)."[39]   The parties agree that Smith contacted and interviewed new employee applicants, but Smith insists that he had no authority to approve new hires.[40]

The parties agree that Ochsner hired Smith in April of 2001, but they disagree about the structure of his pay during the period from 2001 to 2012.[41]   While Smith contends that he reported hours worked and received only straight time pay for all hours worked, Ochsner maintains that Smith was paid a yearly salary, plus a nominal hourly fee for on-call time and an additional straight hourly rate for work conducted outside of his normal shifts.[42]   However, the parties agree that, from 2012 through his resignation in 2017, Ochsner paid Smith an annual salary and a single bonus.[43]   Further, the parties agree that, as of September 29, 2014 (three years prior to the filing of the complaint), Smith's annual salary was $121,971.20 (a weekly salary of $2,345.60) and that

---

[39] R. Doc. 33-4 at 58-59.
[40] R. Doc. 38-15 at 17-18.
[41] *Id.* at 1-2.
[42] *Id.* at 2.
[43] *Id.* at 3.

Smith would have been paid over $100,000 in 2017 had he not taken medical leave that year, as his weekly salary remained $2,345.60 until his resignation.[44]

## II.    PENDING MOTIONS

In its motion for summary judgment, Ochsner seeks the dismissal of Smith's overtime claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, on the grounds that Smith was exempt from FLSA's overtime provisions pursuant to the administrative and highly compensated employee exemptions.[45]    Alternatively, if Smith was not exempt, and thus misclassified, Ochsner contends Smith cannot show that he was misclassified willfully; therefore, FLSA's two-year statute of limitations should apply.[46]    Finally, Ochsner proposes that the fluctuating workweek method should apply to calculate any damages.[47]  Smith opposes the motion, arguing that Ochsner has not established Smith's exempt status beyond dispute, and that disputed factual issues preclude both the dismissal of the willful violation claim and the application of the fluctuating workweek method.[48]

## III.    LAW & ANALYSIS

### a.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

---

[44] *Id.* at 3-4.
[45] R. Doc. 33-1 at 2.
[46] *Id.*
[47] *Id.*
[48] R. Doc. 38 at 1-2.

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324. To grant summary judgment in favor of a defendant asserting affirmative defenses, the defendant "must establish beyond dispute all of the defense's essential elements." *Bank of La. v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006).

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, __,

134 S. Ct. 1861, 1866 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Nor must the court consider uncited evidence in the record. Fed. R. Civ. P. 56(c)(3).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### b. FLSA's Exemptions Warrant a "Fair Reading"

The Fair Labor Standards Act requires employers to pay non-exempt employees overtime for working more than 40 hours in a week. 29 U.S.C. § 207(a). Exempt employees are not required to be paid overtime. 29 U.S.C. § 213(a). The employer bears the burden of proving the exemptions as affirmative defenses. *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 584 (5th Cir. 2006). The amount of time the employee devotes to particular duties and the significance of those duties are questions of fact; whether an employee's salary and duties ultimately satisfy an exemption is a

matter of law. *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 352 (5th Cir. 2015) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)); *see also Dalhiem v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir. 1990). FLSA's exemptions must be given a "fair reading" rather than being construed narrowly against the employer. *Encino Motorcars v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

### c. The Administrative Exemption

An employee falls under the administrative exemption when (1) the employee is "compensated on a salary or fee basis at a rate of not less than $455 per week"; (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).[49]

While Smith concedes that the first element is met,[50] he contends that Ochsner has not established beyond dispute the second and third elements.

---

[49] *See Nevada v. U.S. Dep't of Labor*, 275 F. Supp. 3d 795, 807-08 (E.D. Tex. 2017) (holding the Department of Labor exceeded its authority in raising the minimum salary requirement to $913 per week for the executive, administrative, and professional exemptions in the 2016 amendments to 29 C.F.R. pt. 541, thus enjoining the amendment's implementation and instead applying the 2004 regulations) *appeal filed*, No. 17-41130 (5th Cir. Nov. 2, 2017); *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 534 (E.D. Tex. 2016) (issuing preliminary injunction) *appeal dismissed*, No. 16-41606 (5th Cir. Dec. 1, 2016); *see also Buford v. Superior Energy Servs., LLC*, 2018 WL 2465469, at *9 n.2 (E.D. Ark. June 1, 2018) (applying regulations in effect prior to injunction); *Melton v. Lawrence*, 2018 WL 5723942, at *2 nn.4 & 5 (applying the amended basis-level test and not reaching the salary-level test).

[50] Smith agrees that he was paid $2,345.60 per week for the three years prior to filing this action. *See* R. Doc. 38-15 at 3-4. Thus, Smith exceeds even the amended salary-level test. *See supra* note 49. Additionally, Smith does not point to evidence to refute that he was paid on a salary basis without regard to hours worked for the three years prior to filing the action. *See* R. Doc. 38-15 at 3-4; *see also* R. Doc. 38-5 at 3. Thus, Smith satisfies the salary-level and salary-basis tests. *See* 29 C.F.R. §§ 541.600, 541.602.

### i. The Second Element: Whose Primary Duty Is the Performance of Office or Non-Manual Work Directly Related to the Management or General Business Operations of the Employer or the Employer's Customers

Under this second element, the question is whether Smith's primary duty as a transplant coordinator is the performance of office or non-manual work directly related to the management or general business operations of Ochsner or Ochsner's customers. The term "primary duty" is defined as the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Courts consider the following non-exhaustive factors: (1) "the relative importance of the exempt duties as compared with other types of duties"; (2) "the amount of time spent performing the work"; (3) "the employee's relative freedom from direct supervision"; (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* While time is not the sole test, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 707 (S.D. Tex. 2012) (quoting 29 C.F.R. § 541.700(b)). Additionally, job responsibilities that "are of principal value to the employer" are considered primary. *Id.* at 706-07 (quoting *Dalheim*, 918 F.2d at 1227).

Office or non-manual work is distinguished from "work involving repetitive operations with … hands, physical skill and energy," such as that done by "non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, [and] mechanics." 29 C.F.R. § 541.601(d).

For the duty to be "directly related to the management or general business operations of the employer or the employer's customers," the type of work must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a

manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a). The employee's duties, rather than the job title alone, are significant. *Id.* § 541.200. The regulation describes "work directly related to management or general business operations" in an illustrative list of "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; … [and] legal and regulatory compliance." *Id.* § 541.201(b). The Fifth Circuit distinguishes such work from "production activity" that creates a commodity sold by the employer. *See Dewan v. M-I, L.L.C.*, 858 F.3d 331, 336 (5th Cir. 2017). This distinction has been termed "the administrative-production dichotomy." *Id.* at 336 (citing *Dalheim*, 918 F.2d at 1230). However, the dichotomy has limited application when the employer provides a service rather than a product. *Id.* (citing *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 532 (2d Cir. 2009)). Rather, many courts describe the key distinction to be "between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business." *Davis*, 587 F.3d at 535-37 (collecting cases); *see also Dewan*, 858 F.3d at 337-38.[51]

In examining the administrative exemption, the Fifth Circuit in *Zannikos v. Oil Inspections (U.S.A.), Inc.* directly compared the employees' duties to the "functional" examples in 29 C.F.R. § 541.201(b). 605 F. App'x at 353 (5th Cir. 2015). There, the Fifth Circuit upheld the district court's finding that marine superintendents satisfied the second element of the administrative

---

[51] Notably, though, *Dewan* and *Davis* relied on the since-rejected premise that the exemptions are construed narrowly against the employer, as opposed to "fairly read." *Compare Encino*, 138 S. Ct. at 1142, *with Dewan*, 858 F.3d at 334, *and Davis*, 587 F.3d at 532. The Second Circuit in *Davis* went so far as to interpret administrative duties as fundamentally policy-oriented, describing them as "the heart of the business." 587 F.3d at 535. In so doing, *Davis* described administrative duties as "primarily conceptual rather than functional" – a characterization that plainly contradicts the regulations' list of "functional" areas as illustrative of work directly related to management or general business operations. *Id.*; *see* 29 C.F.R. § 541.201(b).

exemption – namely, that the employees' office or non-manual work directly related to the management or general business operations of the employer or its customers. *Id.* at 354. The employer oversaw oil cargo transfers "to ensure that the oil is transferred in accordance with industry standards and customer specifications." *Id.* at 351. It employed marine superintendents to "observe[] oil transfers to verify that performance was accurate, legal, and safe." *Id.* Among other duties*,* marine superintendents "monitored and reported on transfers' compliance with [the employer's] safety policies and nationally recognized safety standards; and performed quality control functions, including inspecting loading and discharging equipment, identifying problems with equipment safety or calibration, and recommending remedial measures." *Id.* The plaintiffs' duties were "not considered production" because they "primarily included supervision, quality control, and ensuring compliance with applicable standards," which also "included work in several functional areas explicitly listed as administrative in Section 541.201(b), including quality control, safety, and legal and regulatory compliance." *Id.* at 353.

In contrast, the Fifth Circuit in *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 338 (5th Cir. 2017), found that mud engineers, unlike the superintendents in *Zannikos,* did not unquestionably exercise a supervisory role in ensuring compliance with health and safety standards. There, mud engineers were tasked with ensuring that properties of drilling fluid matched specifications set forth in a "mud plan" prepared by project engineers. *Id.* at 333. In reversing the district court's summary judgment in favor of the employer, the Fifth Circuit reasoned that "quality control" as listed in the regulations meant broadly ensuring the quality of the mud delivered to customers, "not … monitoring and adding materials to the mud as it is being used in drilling wells to ensure that its properties stay within the specifications set forth in the mud plan developed by project engineers."

*Id.* at 337. Therefore, the Fifth Circuit held that disputes of material fact existed as to whether the mud engineers fell under the administrative exemption. *Id.* at 333.

In advancing the administrative exemption as to Smith, Ochsner compares his duties to several of the illustrative examples of "work in functional areas" listed in 29 C.F.R. § 541.201(b), including quality control, purchasing, procurement, and legal and regulatory compliance.[52] Ochsner emphasizes that procurement was at the core of an organ ***procurement*** coordinator's duties and responsibilities.[53] Ochsner contends that "quality control … could be argued as one of the main function [sic] of Plaintiff's position," given that organ procurement coordinators must ensure the quality of organs for Ochsner's patients, and that organ procurement coordinators "were largely responsible for the literal procurement, or recovery, of organs … for Ochsner's patients."[54] Organ procurement coordinators were also responsible for purchasing supplies, which could exceed $10,000 per order, and which required no pre-approval.[55] Ochsner also urges that Smith contributed to legal and regulatory compliance by correctly advocating for Ochsner to receive an organ when LOPA violated UNOS protocol by withholding it.[56] Finally, Ochsner contends that Smith's role in hiring new candidates contributed to Ochsner's general business operations.[57]

While not disputing that Smith's primary duties consisted of office or non-manual work,[58] Smith contends that Ochsner mischaracterizes his duties as administrative when, in fact, they were

---

[52] R. Doc. 33-1 at 18-19.
[53] *Id.* at 19.
[54] *Id.*
[55] *Id.*
[56] *Id.* at 20.
[57] *Id.* (citing *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 332 (5th Cir. 2000)).
[58] Smith does not refute Ochsner's assertion that he spent the large majority of his time acting as donor coordinator. *See* R. Doc. 38-15 at 5. Ochsner's Job Performance Standards place thirty percent weight on receiving and transporting the organs (including verifying consent and the medical chart) and another fifteen percent weight on receiving calls. R. Doc. 33-4 at 58-59. The assigned weight does not necessarily correspond with mathematical precision to the number of hours spent transporting organs, which time included analytical work performed while discharging such duties. Furthermore, all four categories of duties of the organ procurement coordinator (donor, fly out, administrative, and backup) involved primarily non-manual work, such as reading and entering data, communicating with the surgeon, and ordering supplies and transportation.

production-oriented, in that Smith primarily helped to "produce" organ transplants. Smith claims that he "exercised zero control over what organs are available nor ensured the quality of those available organs," because the donor matching program and UNOS protocol determined availability, and the surgeon determined quality.[59] Moreover, to the extent that he purchased supplies, Smith contends Ochsner puts forward no evidence to show that doing so was his primary duty during the statutory period, nor that $10,000 orders were of relative importance in Ochsner's general business operations. Smith emphasizes that his job title as "organ procurement coordinator" is irrelevant to whether his job entails procurement related to Ochsner's general business operations under the FLSA regulations; in contrast to business procurement and purchasing agents who enter into contracts on behalf of Ochsner, Smith merely worked with resources already procured (or contracts already negotiated) in arranging organ transportation. Finally, Smith argues that he did not ensure Ochsner's general legal or regulatory compliance; rather, operating under LOPA's and UNOS's strict protocol for organ transplants, Smith suggests that he was merely the regulated party.[60]

There really is no dispute that Smith's primary duty was that of donor coordinator.[61] In that role, Smith was tasked with providing a "provisional yes" when the organ fit UNOS's regulatory criteria and saying "no" when it did not. These functional duties entailed aspects of quality control and legal and regulatory compliance not unlike the employees in *Zannikos* who ensured the quality and regulatory compliance of oil transfers. Organ procurement coordinators like Smith play a central role in ensuring the quality and regulatory compliance of Ochsner's business of transplantation. After all, it is Ochsner (not just Smith) that is the regulated entity, and

---

[59] R. Doc. 38 at 9.
[60] *Id.* at 9-13.
[61] *See supra* note 58.

15

Ochsner depended upon Smith to administer its program of organ procurement and transplant to comply with the legal and regulatory requirements imposed on Ochsner. While Smith's job title as "organ procurement coordinator" is not determinative, it is accurately descriptive, in that Smith's job involves the procurement of organs – a primary duty related to Ochsner's business operation of providing transplant medical services. Moreover, though perhaps not his primary duty, it is undisputed that Smith performed other administrative duties such as ordering supplies that could cost Ochsner $10,000 or more, arranging for the transportation of the donated organs, and interviewing candidates for positions in Ochsner's transplant department. In sum, even viewing the uncontested facts and inferences in the light most favorable to the nonmovant, the Court concludes, like the court in *Zannikos*, that Smith's work as a transplant coordinator was office or non-manual and directly related to the management or general business operations of Ochsner in the functional areas of quality control, procurement, and legal and regulatory compliance. Hence, the second element of the administrative exemption is satisfied.

### ii. The Third Element: Whose Primary Duty Includes the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance

The Court now turns to the third element of the administrative exemption to ask whether Smith exercised discretion and independent judgment with respect to matters of significance. The regulations explain that exercising discretion and independent judgment generally "involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed" and not solely the magnitude of the employer's potential financial loss if the employee fails to perform the job properly. 29 C.F.R. § 541.202(a) & (f). In a totality-of-the-circumstances analysis of this element, courts consider factors including the following:

whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b). While the exemption "implies that the employee has authority to make an independent choice, free from immediate direction or supervision[,] … [e]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c). Moreover, "the use of manuals, guidelines or other established procedures containing or relating to highly technical scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption." *Id.* § 541.704.

Conversely, "the exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e). For instance, the Fifth Circuit in *Clark v. Centene Co. of Texas, L.P.*, 656 F. App'x 688, 693 (5th Cir. 2016), held that insurance case managers' duties did entail the kind of discretion and independent judgment required under the administrative exemption. There, the case managers' primary responsibility was to conduct "utilization review" of claims in order to manage health insurance policies. *Id.* at 689. Specifically, the employer tasked the case managers with determining the medical necessity and appropriateness of medical authorization requests by health care providers. *Id.* This required "collecting and reviewing

medical information and comparing the information to established guidelines to determine whether the request should be approved. If the request does not meet the established criteria, Case Managers did not have the authority to deny the request, but were instructed to refer the case to a Medical Director." *Id.* at 692. Reaching a determination required "strictly applying the facts to the guidelines," as the employer's policy was to ensure "impartial and consistent utilization decisions." *Id.* Finding that the employer's "entire utilization process seem[ed] designed to minimize the amount of discretion and independent judgment employed by Case Mangers," the Fifth Circuit held that the case managers did not fall within the administrative exemption. *Id.* at 692-93. Though case managers were required to be familiar with technical matters such as "medical documents, patient, information, and health-related terminology," and were even provided some latitude in decision-making, the Fifth Circuit found these duties to be more aligned with the non-exempt inspector-type duties. *Id.* In a similar fashion, the Fifth Circuit in *Zannikos* held that marine superintendents did not exercise discretion (like evaluating alternative courses of action) and independent judgment in performing their work, but functioned more like inspectors. 605 F. App'x at 355-56.

Ochsner cites a litany of Smith's job duties to urge that they satisfy the third element of the administrative exemption, claiming that "almost every aspect" of the organ procurement coordinators' duties – particularly the decision to accept or reject an organ – involved discretion and independent judgment "related to matters of significance – in many ways, life or death."[62] In addition to arranging transportation and ordering supplies necessary for maintaining the organ (without supervisory approval), communicating the organ's status to the surgeon in transport, and determining the rotating schedule of duties, the coordinators decided whether to enter a provisional

---

[62] R. Doc. 33-1 at 21-22.

yes or no to an organ offer.[63]   According to Dr. Loss, this decision involved distilling the donor's

information into a cogent story for presentation to the transplant surgeon in a short time frame.[64]

On occasion, Ochsner argues, Smith even made the decision to accept or reject an organ before

contacting a surgeon.[65]   And, Ochsner continues, the coordinators worked without daily

supervision.[66]

Downplaying his purported discretion and independent judgment, Smith analogizes his

duties to those of a senior legal analyst who was the subject of a Department of Labor ("DOL")

opinion letter (FLSA 2006-27).[67]  The analyst prepared reports for attorneys.  The DOL determined

that while this work required self-prioritization of labor with no supervision, it was the attorney,

not the analyst, who actually exercised discretion and independent judgment.  Invoking 29 C.F.R.

§ 541.202(e), Smith argues that merely using skill to apply well-established techniques,

procedures, or specific standards described in manuals or other sources is insufficient to

demonstrate discretion or independent judgment.   Smith thus contends that in performing his job

he merely applied Ochsner's established procedures and criteria, as strictly prescribed by UNOS,

under the direction of the transplant surgeon.  Smith says he was a "conduit" of information and

had no discretion to withhold information.  Even if he declined an organ before contacting the

surgeon, Smith posits that the surgeon would have subsequently declined it anyway.  In Smith's

view, the surgeons and Ochsner's organ committees, not the transplant coordinators, exercised the

discretion and independent judgment in matters related to organ procurement.[68]

---

[63] *Id.*
[64] *Id.* at 5-7.
[65] *Id.* at 21.
[66] *Id.* at 22.
[67] R. Doc. 38 at 6.
[68] *Id.* at 13-14.

Smith further contends that none of his regular or customary duties fit beyond dispute in the duties illustrative of discretion and independent judgment listed in 29 C.F.R. § 541.202(b), while courts typically require at least two to three. Smith denies that the transplant coordinators exercised the primary duty of managing schedules or ordering supplies. Smith also disputes whether he had authority to commit Ochsner in matters having significant financial impact, because, though Smith could arrange for transportation and order supplies costing up to $10,000, such arrangements and orders were pre-authorized by Ochsner and relatively small in comparison to the company's overall size.[69]

Smith's role as transplant coordinator involves him in discretionary decision-making requiring independent judgment, as part of a team at Ochsner. There is no doubt that decisions and judgments about organ donations are critical, and participation on a team does not necessarily undercut the significance of Smith's own role in such decision-making. Nevertheless, on this summary judgment record, the Court finds that genuine disputes of material fact exist relating to Smith's exercise of discretion and independent judgment. While the evidence supports Smith's adherence to "closely prescribed limits" that would not qualify him as exempt, the evidence also supports Smith's involvement in discretionary decision-making. *See id.* § 541.704. "This is evidence that must be weighed by a jury." *Dewan*, 858 F.3d at 340. Therefore, the Court holds that Ochsner has not established beyond dispute all the requisite elements of the affirmative defense of an administrative exemption to FLSA's overtime requirements.

### d. Highly Compensated Employee Exemption

An employee is exempt under the "highly compensated employee" exemption if (1) the employee's "primary duty includes performing office or non-manual work"; (2) the employee

---

[69] *Id.* at 14-21.

receives total annual compensation of at least $100,000;[70] and (3) the employee "customarily and regularly performs any one or more of the exempt duties or responsibilities of an … administrative … employee."  29 C.F.R. § 541.601.  There is no dispute that Smith's primary duty includes performing office or non-manual work, or that he received total annual compensation of at least $100,000 for the three years preceding the filing of this action.[71]  Therefore, the Court turns to the third element.

The regulations define the phrase "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant.  Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."  *Id.* § 541.701.

And the "highly compensated employee" regulation explains that "[a] high level of compensation is a strong indicator of an employee's exempt status, ***thus eliminating the need for a detailed analysis of the employee's job duties.***  Thus, a highly compensated employee will qualify for exemption if the employee customarily and regularly performs ***any one or more of the exempt duties or responsibilities*** of an executive, administrative or professional employee identified in subparts B, C or D of this part."  29 C.F.R. § 541.601(c) (emphasis added).  To qualify as a highly compensated administrative employee, the employee does not need to meet all of the requirements for the administrative exemption under 29 C.F.R. § 541.200.

---

[70] *See supra* note 49  The same reasoning arguably applies to invalidate the 2016 amendment's minimum wage for the highly compensated employee exemption, and the parties do not argue that the higher threshold applies. Thus, the Court applies the 2004 regulation's minimum threshold of $100,000. *See also Hines v. Key Energy Servs., LLC*, 2017 WL 2312931, at *7 n.9 (E.D. Ark. May 26, 2017); 3 THOMPSON REUTERS, EMPLOYMENT COORDINATOR § 3:26 Westlaw (database updated Nov. 2018).

[71] Smith does contend he was paid on an hourly basis rather than as a salaried employee prior to 2012. However, Smith admits that he was paid on a salary basis at an annual salary of $121,971.20 for the three years prior to filing the action.

The question for the Court, therefore, is whether Smith customarily and regularly performed any one or more of the exempt duties or responsibilities of an administrative employee. The terms "duties" and "responsibilities" are not defined by the regulation. Many courts have found that the exemption applies when the employee meets either the second or third element of the administrative exemption. *See, e.g.*, *Ogden v. CDI Corp.*, 2009 WL 4508502, at *2 n.2 (noting employer "need not prove [the employee] exercised discretion or independent judgment in the performance of his duties," but requiring proof that his duty is the performance of office or non-manual work directly related to the management or general business operations of his employer); *Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273, 1203-04 (C.D. Cal. 2015) ("At least one regularly performed duty or task must fall squarely within … one of the 'duties' prong of the administrative exemption."). But these courts, in a pre-*Encino* world, applied the exemptions narrowly against the employer, looked only to the elements of the administrative exemption, and ignored the regulation's directive to forego a rigorous analysis of the employee's job duties in light of the employee's high compensation. A "fair reading" of the phrase "any one or more of the exempt duties or responsibilities … of an administrative employee," though, cannot mean that the employer must prove one of the administrative exemption elements as they are analyzed for purposes of that exemption. If that were so, the highly compensated employee regulation would have explicitly referred to the elements, not the "duties or responsibilities," of the administrative employee. Instead, a "fair reading" of the phrase "any one or more of the exempt duties or responsibilities of … an administrative employee" would encompass work in the functional areas listed in 29 C.F.R. § 541.201(b), including "quality control; purchasing; procurement; … legal and regulatory compliance; and similar activities."

In discussing the administrative exemption in Section III(c)(i) above, the Court concluded that Smith's primary duty involved the performance of non-manual work directly related to the management or general business operations of Ochsner.  This conclusion necessarily satisfies the remaining element of the exemption for highly compensated employees.  But Ochsner is not required to go even this far to prevail on the highly compensated employee exemption; instead, just one of the purportedly exempt employee's "duties or responsibilities" need be of an administrative character related to Ochsner's management or general business operations and customarily and regularly performed by the employee, and it need not be his primary duty.  This relaxed standard applies because most of the water for the exemption is carried by the employee's high level of compensation.  *See, e.g., Hicks v. Mercedes-Benz U.S. Int'l, Inc.*, 2012 WL 1566140, at \*6 (N.D. Ala. Apr. 30, 2012) ("[T]he need to examine job duties is considerably relaxed for the highly compensated exemption; an employee need only perform *one or more* exempt duties customarily and regularly.") (emphasis in original).

So the question boils down to whether, on the summary judgment record before the Court, any one of Smith's duties or responsibilities was exempt and regularly performed.  The Court concludes that at least one of Smith's duties and responsibilities as an organ procurement coordinator involved legal or regulatory compliance (for example, in provisionally accepting or declining organ offers), quality control (for example, in regard to the donated organs or Ochsner's organ transplant program), procurement (of organs pursuant to Ochsner's transplant program), or purchasing (for example, ordering and stocking supplies required by Ochsner's surgeons and by the regulation governing organ donations and transplants) that was thus administrative in nature, was customarily and regularly performed by Smith, and thereby satisfies the final element to qualify Smith as a highly compensated employee exempt from FLSA's overtime requirements.

Having found that Ochsner is entitled to summary judgment on the highly compensated employee exemption, the Court does not reach the merits of the parties' arguments on the applicable statute of limitations and standard for assessing damages.

## IV.    CONCLUSION

**IT IS ORDERED** that Ochsner's motion for summary judgment, R. Doc. 33, is **GRANTED** and that this case is hereby dismissed with prejudice.

New Orleans, Louisiana, this 13th day of November, 2018.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE